UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

U.S. SECURITIES AND EXCHANGE COMMISSION,
100 F Street, NE
Washington, D.C. 20549

    Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION

    Defendant.

Civil Action No. _____

COMPLAINT

---

Plaintiff, Securities and Exchange Commission ("Commission"), alleges:

## SUMMARY

1. During the period from 1998 through 2009, in violation of the Foreign Corrupt Practices Act of 1977 ("FCPA"), employees of certain of International Business Machines Corporation's ("IBM" or the "Company") subsidiaries and a majority-owned joint venture provided cash payments, improper gifts, as well as improper travel and entertainment to government officials in South Korea and China.

2. From 1998 to 2003, employees of IBM Korea, Inc. ("IBM-Korea"), an IBM subsidiary, and LG IBM PC Co., Ltd. ("LG-IBM"), a joint venture in which IBM held a majority interest, made payments to various government officials in South Korea. The purpose of these payments was to secure the sale of IBM products through IBM-Korea and LG-IBM's business partners. During the relevant period, these managers paid approximately KRW 216,832,500 (South Korean Won), or $207,000, in cash bribes to South Korean government officials, including providing improper gifts and payments of travel and entertainment expenses.

3. From at least 2004 to early 2009, employees of IBM (China) Investment Company Limited and IBM Global Services (China) Co., Ltd. (collectively, "IBM-China"), both wholly-owned IBM subsidiaries, engaged in a widespread practice of providing overseas trips, entertainment, and improper gifts to Chinese government officials. The misconduct in China involved several key IBM-China employees and more than 100 IBM China employees overall.

4. Despite its extensive international operations, IBM lacked sufficient internal controls designed to prevent or detect these violations of the FCPA. During the period 1998 to 2009, IBM had corporate policies prohibiting bribery and procedures relating to compliance with the FCPA; however, deficient internal controls allowed employees of IBM's subsidiaries and joint venture to use local business partners and travel agencies as conduits for bribes or other improper payments to South Korean and Chinese government officials over long periods of time.

5. During the period 1998 to 2009, IBM failed to make and keep books and records that accurately reflected the improper payments made in South Korea and China. Instead, these payments were recorded as legitimate business expenses.

6. By its conduct, defendant IBM violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] by failing to maintain an adequate internal control system to detect and prevent improper payments and by improperly recording these payments in its books and records. Unless restrained and enjoined by the Court, defendant IBM will continue to engage in acts and practices that constitute, or will constitute, violations of these provisions.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. Venue in the District of Columbia is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9. In connection with the conduct described herein, IBM, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

## DEFENDANT

10. IBM is a New York corporation based in Armonk, New York. IBM develops and manufactures information technology products and services worldwide. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange (NYSE: IBM).

## OTHER RELEVANT ENTITIES

11. IBM-Korea is a South Korean corporation wholly-owned indirectly by IBM International Group B.V., which, in turn, is wholly-owned by IBM. IBM-Korea sells IBM products in South Korea.

12. LG-IBM was a South Korean joint venture formed in 1996 by IBM-Korea and LG Electronics Inc. ("LG") to sell personal computers in South Korea. IBM-Korea owned 51% of LG-IBM and LG owned the remaining 49% of the joint venture.

13. IBM-China is a company used by IBM for direct sales to IBM's customers in China. IBM-China is owned by IBM China/Hong Kong Limited, a Hong Kong company that is ultimately owned by IBM.

## FACTS

A. **Payments To Government Officials Of South Korea**

14. From 1998 through 2002, IBM-Korea and LG-IBM employees made improper cash payments to South Korean government officials. IBM-Korea and LG-IBM employees paid

3

a total of approximately $135,558 and $71,599 in cash bribes, respectively. LG-IBM also provided free personal computers to, and paid for the entertainment expenses of, these officials. The foreign government officials involved worked for sixteen South Korean government entities ("SKGE").

### *IBM-Korea Paid Bribes To Government Officials Of SKGE 1*

15. In mid-December 1998, IBM-Korea's Territory Manager for the Public Sector ("Territory Manager") met the Chief of Operations for the Electronic Operations Division of SKGE 1 ("SKGE 1 Operations Chief") and gave him a shopping bag containing a large IBM-Korea envelope filled with KRW 20 million ($19,093). The Territory Manager paid similar bribes to the SKGE 1 Operations Chief at the same time and location between 1999 and 2001. In total, the Territory Manager made payments totaling KRW 80 million ($76,372) to the SKGE 1 Operations Chief in exchange for designating IBM-Korea a preferred supplier of mainframe computers to SKGE 1 and for placing orders with IBM-Korea at higher prices.

16. IBM-Korea's Cluster Manager for the Public Sector ("Cluster Manager") also paid several bribes to an employee of SKGE 1 ("SKGE 1 Official"). Between December 2000 and September 2002, the Cluster Manager delivered a total of KRW 22 million ($21,000) in cash to the SKGE 1 Official, who was responsible for purchasing mainframe computers for SKGE 1. Each time, the Cluster Manager placed the cash in large IBM-Korea envelopes and handed them to the SKGE 1 Official at parking lots near the latter's office and apartment complex. These cash payments were made in exchange for (1) maintaining IBM-Korea as the supplier of mainframe computers to SKGE 1; and (2) for helping an IBM-Korea business partner win bids to supply mainframe computers and storage equipment to SKGE 1 worth more than KRW 22 billion ($21 million).

4

### *IBM-Korea Paid Bribes To A Government Official Of SKGE 2*

17. In 2002, the IBM-Korea Cluster Manager made two payments totaling KRW 40 million ($38,186) to a manager of the government-controlled SKGE 2. In each case, the Cluster Manager handed a shopping bag containing KRW 20 million ($19,093) in cash to SKGE 2's Manager of Information Business ("SKGE 2 Manager") first at a parking lot of a Japanese restaurant and then later at a parking lot behind the SKGE 2 Manager's apartment. The payment was made in exchange for the SKGE 2 Manager's assistance to IBM-Korea in obtaining a contract with SKGE 2 worth approximately KRW 13.7 billion ($13 million) for the installation of a mainframe computer in 2002.

### *LG-IBM Paid A Bribe And Gave Improper Gifts To Government Officials Of SKGE 3*

18. In September 2000, LG-IBM sold 1,596 personal computers to SKGE 3 for approximately KRW 1.4 billion ($1.3 million). LG-IBM was required at the time to participate in a benchmarking test to qualify for SKGE 3's personal computer supply contract. During the test, certain problems were detected in LG-IBM's computers. Because of these problems, LG-IBM's Manager of Special Sales ("Special Sales Manager") contacted SKGE 3's Director of Planning ("SKGE 3 Official") to ask for help in winning SKGE 3's personal computer supply contract. LG-IBM later won the contract.

19. The Special Sales Manager directed one of LG-IBM's business partners to "express his gratitude" to the SKGE 3 Official by providing KRW 15 million ($14,320) to the SKGE 3 Official. In turn, the LG-IBM business partner was "adequately compensated by generous installation fees" paid by LG-IBM. This transaction was not accurately recorded in LG-IBM's books and records.

20. LG-IBM also provided free notebook computers to SKGE 3 employees to entice them to purchase IBM products.

### *LG-IBM Paid A Bribe To A Government Official Of SKGE 4*

21.     SKGE 4 was a state-owned agency of the South Korean government. In late October or early November 2001, an employee of LG-IBM's Public Sector Sales ("Public Sector Sales Employee") made an improper payment of KRW 10 million ($9,546) to an employee of SKGE 4 responsible for reviewing personal computer procurement bids ("SKGE 4 Manager"). The purpose of the bribe was to win a contract to supply 657 (later increased to 825) personal computers valued at KRW 1,448,700,000 ($1,383,007).

22.     At the time, SKGE 4 was soliciting bids to supply personal computers to the agency. The Public Sector Sales Employee contacted the SKGE 4 Manager to ask for SKGE 4's internal target price. The SKGE 4 Manager declined to provide that information but told the Public Sector Sales Employee, "You have to win the contract, then I can help you." The Public Sector Sales Employee understood this statement to mean that he should submit a low bid and the SKGE 4 Manager would help him make up the difference between LG-IBM's bid and SKGE 4's internal target price after LG-IBM won the contract.

23.     After LG-IBM won the contract, the SKGE 4 Manager took the Public Sector Sales Employee to the SKGE 4 Manager's office where they replaced LG-IBM's winning bid sheet with a new bid sheet. The new bid sheet showed a price that was KRW 30 million ($28,640) higher than LG-IBM's original bid. The new, higher price was closer to SKGE 4's internal target price.

24.     The Public Sector Sales Employee then contacted LG-IBM's business partner who was to install the computers and directed the company's president to make a payment to the SKGE 4 Manager. The LG-IBM business partner overbilled LG-IBM for the installation cost and used the extra money to pay the SKGE 4 Manager. On or about December 29, 2001, the

president of LG-IBM's business partner caused approximately KRW 15 million ($14,320) in cash to be delivered to the SKGE 4 Manager.

25. In February 2002, after the installation was completed, LG-IBM made two separate payments to the LG-IBM business partner. The first payment was KRW 24,600,000 ($23,485), which was designated as a payment for installation services. The second payment of KRW 15,330,000 ($14,635) was the reimbursement for the payment to the SKGE 4 Manager.

### *LG-IBM Paid A Bribe To A Government Official Of SKGE 5 And Improperly Paid For Entertainment Expenses*

26. In August 2002, LG-IBM's manager of Direct Sales ("Direct Sales Manager") and Special Sales Manager provided dinner and entertainment to a South Korean government official, who was the Director of SKGE 5's information technology department ("SKGE 5 Official") and responsible for procurement decisions, and his subordinate. After the meal and a few drinks, the Special Sales Manager gave KRW 20 million ($19,093) cash to the SKGE 5 Official. The Special Sales Manager later told the Direct Sales Manager, "I have done my part." The payment of KRW 20 million ($19,093) was made to the SKGE 5 Official in exchange for providing LG-IBM with certain confidential information regarding the product specifications on SKGE 5's request for procurement. The funds used to bribe the SKGE 5 Official was provided by LG-IBM's business partner, a company that received an overpayment from LG-IBM for installation services. LG-IBM entered into a contract with SKGE 5 to supply 1,790 personal computers and 1,790 Local Area Network (LAN) cards for a total contract price of approximately KRW 1.74 billion ($1.7 million).

### *LG-IBM Provided Gifts And Improperly Paid For Travel And Entertainment Expenses For Government Officials Of SKGE 6*

27. In 2001, LG-IBM sold 1,550 personal computers and other equipment to SKGE 6 for a contract value of KRW 16 billion ($15.3 million). KRW 40 million ($38,186) was paid to

an LG-IBM business partner for software services, even though the LG-IBM business partner did not provide any software services. Instead, the LG-IBM business partner returned KRW 34 million ($32,458) to the LG-IBM Direct Sales Manager and the funds were deposited in his own personal bank account and used to fund improper gifts for, and entertainment of, government officials. The LG-IBM business partner retained the difference of KRW 6 million ($5,728).

28. During the period 2001 through 2003, the Direct Sales Manager entertained and provided gifts to employees of SKGE 6. These included payments to the bank account of a "hostess in a drink shop," as well as on travel and entertainment expenses for employees of SKGE 6. The purpose of these improper payments was to persuade employees of SKGE 6 to purchase IBM products.

29. The Direct Sales Manager also generated money for entertainment expenses by selling laptop computers that were billed to the government customer. The value of the laptop computers was added to orders placed by SKGE 6, and the transactions recorded as if the laptops were provided to the customer.

30. LG-IBM also provided free computers to certain key decision makers at SKGE 6 to entice them to purchase IBM products.

*LG-IBM Gave Improper Gifts To Officials Of Other South Korean Government Entities*

31. LG-IBM also provided free computers and computer equipment to key decision makers at ten other SKGEs to entice them to purchase IBM products or to provide information to assist LG-IBM in the bidding process.

**B.    Payments to Government Officials Of China**

32. From at least 2004 to early 2009, IBM-China employees created slush funds at local travel agencies in China that were then used to pay for overseas and other travel expenses incurred by Chinese government officials. In addition, IBM-China employees created slush

8

funds at its business partners to provide a cash payment and improper gifts, such as cameras and laptop computers, to Chinese government officials. IBM failed to record accurately these payments in its books and records.

### *IBM-China Employees Created Slush Funds To Pay For Travel And Entertainment Expenses Of Chinese Government Officials*

33.  As part of its business, IBM-China entered into contractual agreements with its government-owned or controlled customers in China for hardware, software, and other services. These contracts contained provisions requiring IBM-China to provide training to the employees of these customers given the high-tech nature of IBM's products and services. In some cases, IBM held this training offsite and required the customers to travel. In advance of any training trips, IBM-China employees were required to submit a Delegation Trip Request ("DTR") detailing the business purpose of the trip, all planned sightseeing or entertainment activities, and anticipated expenses. The DTRs required approval by IBM-China managers. IBM-China's policies required customers to pay for side-trips and stopovers unrelated to the training.

34.  Between 2004 and 2009, IBM's internal controls failed to detect at least 114 instances in which (1) IBM-China employees and its local travel agency worked together to create fake invoices to match approved DTRs; (2) trips were not connected to any DTRs; (3) trips involved unapproved sightseeing itineraries for Chinese government employees; (4) trips had little or no business content; (5) trips involved one or more deviations from the approved DTR; and (6) trips where per diem payments and gifts were provided to Chinese government officials. Moreover, IBM-China personnel also used its official travel agency in China to funnel money that was approved for legitimate business trips to fund unapproved trips. IBM-China personnel utilized the company's procurement process to designate its preferred travel agents as "authorized training providers." IBM-China personnel then submitted fraudulent purchase

requests for "training services" from these "authorized training providers" and caused IBM-China to pay these vendors. The money paid to these vendors was used to pay for unapproved trips by Chinese government employees.

35. The misconduct in China involved two key IBM-China managers, who planned customer trips, and more than 100 IBM-China employees.

## CLAIMS FOR RELIEF

### FIRST CLAIM

*Violations of Section 13(b)(2)(A) of the Exchange Act*

36. Paragraphs 1 through 35 are re-alleged and incorporated by reference.

37. As detailed above, IBM failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected IBM's transactions and the disposition of its assets.

38. By reason of the foregoing, IBM violated, and unless enjoined will continue to violate, Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)] of the Exchange Act.

### SECOND CLAIM

*Violations of Section 13(b)(2)(B) of the Exchange Act*

39. Paragraphs 1 through 35 are re-alleged and incorporated by reference.

40. As detailed above, IBM failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances, among other things, that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for its assets.

41. By reason of the foregoing, IBM violated, and unless enjoined will continue to violate, Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A. Permanently restraining and enjoining Defendant IBM from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)];

B. Ordering IBM to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct; and

C. Granting such further relief as the Court may deem just and appropriate.

*****

Dated: March 18, 2011                    Respectfully Submitted,

_____
Frederick L. Block      (DC Bar No. 492358)
Cheryl J. Scarboro      (DC Bar No. 422175)
Charles E. Cain
Christine E. Neal
Paul A. Gumagay         (DC Bar No. 489813)

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4919 (Block) – Phone
(202) 772-9245 (Block) – Fax